UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KEVIN P. TINERVIA,           )
                             )
        Plaintiff,           )
                             )        No. 4:08CV00426 FRB
                             )
    v.                       )
                             )
                             )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,          )
                             )
        Defendant.           )

**MEMORANDUM AND ORDER**

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.    Procedural Background**

Kevin P. Tinervia ("plaintiff") filed two applications for Social Security benefits, one for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"), and another for supplemental security income ("SSI") under Title XVI of the Act. (Administrative Transcript ("Tr.") 67-69.)

Plaintiff's applications were initially denied, (Tr. 39-40), and he requested a hearing before an administrative law judge ("ALJ"), which was held on July 11, 2007. (Tr. 25-38.) On August 30, 2007, ALJ Randolph E. Schum issued his decision finding that

-1-

plaintiff was not disabled within the meaning of the Act. (Tr. 13-22.) Plaintiff requested review of the hearing decision, and on February 20, 1998, the Appeals Council denied his request for review. (Tr. 2-5.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  **Evidence Before the ALJ**

### A.  Hearing Testimony

During the administrative hearing, plaintiff testified in response to questions posed by the ALJ and by counsel. When questioned by the ALJ, plaintiff testified that he was 39 years old, and that he had obtained his GED. (Tr. 28.) He testified that he last worked for a sewer service company for two and one-half to three years as a plumbing technician. Id. He testified that he had not worked anywhere since January 15, 2004. Id. Regarding prior employment, plaintiff testified that he spent six years working as a meat clerk, and three years working as a stocker in a grocery store. (Tr. 29-30.) Plaintiff also testified that, before 1990, he worked as a cook at a Kentucky Fried Chicken restaurant, and worked as a security guard for different security companies. (Tr. 30.)

Plaintiff testified that he was fired from the plumbing technician job because he wanted his boss to file a workers' compensation claim for him, but the boss refused. (Tr. 28.) Plaintiff testified that he filed one on his own, which was pending

-2-

at the time of the hearing. (Tr. 28-29.) Plaintiff testified that the alleged date of injury for that workers' compensation claim was in January of 2004, (Tr. 29), and that the injury was to his left shoulder, and both of his elbows. (Tr. 31.)

Plaintiff testified that he was five feet, three inches tall, and weighed 180 pounds. Id. Plaintiff testified that he had had surgery on each elbow, one in 2004, and another in 2006. Id. Plaintiff testified that neck surgery had been recommended to him in January of 2007, but that he had not had that surgery. (Tr. 31-32.) Plaintiff testified that, in April of 2007, he fell while roller skating, and was unable to get up. (Tr. 32.) He testified that he was taken to the hospital, and that radiological studies revealed a tumor in his right leg, on his sciatic nerve. (Tr. 32-33.) Plaintiff testified that the tumor was removed at Barnes Hospital 40 days prior to the hearing. (Tr. 33.) Plaintiff testified that the fall exacerbated his back pain, but that he noticed no difference referable to his neck. Id.

The ALJ noted that plaintiff had a neck MRI performed in August of 2006, and another on April 27, 2007, which was "considerably worse" than the August MRI, and plaintiff testified that he was not told that the second MRI results were worse. Id. Plaintiff testified that he had never had an MRI of his back. Id.

Plaintiff testified that the current problems which prevented him from working full-time were problems using his hands, and with standing or sitting in a chair for very long. (Tr. 34.)

-3-

Plaintiff also testified that "as far as weight or handling things would go, that would be a big problem." Id. Plaintiff testified that he had not attempted vocational rehabilitation. Id. Plaintiff testified that he had diverticulitis, which caused much indigestion. Id. Plaintiff testified that he had no other problems which he felt kept him from working. (Tr. 34.)

Plaintiff then responded to questions from his attorney. Plaintiff testified that, both currently and in the past, he had taken steroids, pain killers, Darvocet, Oxycodone, and Cortisone. (Tr. 35.) Plaintiff testified that he had been having pain in his elbows, legs, low back, neck, and arms. Id. Plaintiff testified that none of the medications provided any long-term relief from the pain in his neck, back, arms or legs, but that they provided temporary relief. Id. Plaintiff testified that the medication made him forgetful and made him sleep a lot, and that he imagined he "would be considered legally intoxicated, too, at the time." Id. Plaintiff's attorney asked plaintiff whether he felt "out of it in general," and plaintiff testified that he did. (Tr. 35.) Plaintiff's attorney asked plaintiff whether the medication affected his "ability to concentrate on doing things and focus on things," and plaintiff testified that they did. (Tr. 35-36.) Plaintiff testified that he took the medications when he had to. (Tr. 36.)

Regarding his daily activities, plaintiff testified that he showered and ate, and that was about all. Id. Plaintiff

-4-

testified that he experienced pain when doing these things.  Id.
Plaintiff's attorney asked him whether his pain increased if he
tried to do other kinds of activities such as household chores or
working in the yard, and plaintiff answered in the affirmative.
Id. Plaintiff's attorney then referenced activities more strenuous
than dressing, preparing a meal, household chores, and yard work,
and asked plaintiff whether he would be able to perform them for
very long.  (Tr. 36-37.)  Plaintiff testified that he would be
unable to because of pain in his legs, lower back, neck and "the
arm."  (Tr. 36-37.)

B.  Medical Evidence

Records from St. Anthony's Medical Center indicate that
plaintiff was seen in the Emergency Room on May 26, 2003 with
complaints that he had not slept in three days.  (Tr. 144-45.)  The
hospital record indicates that plaintiff reported that, three days
prior to his visit, he was nearly shot by the police.  (Tr. 145.)
Plaintiff reported that guns were drawn by each party, but there
was no actual shooting, and that plaintiff felt very anxious and
nervous.  Id.  It is further indicated that plaintiff had not slept
since the police visited his property, and that he was angry and
planned to contact a lawyer.  (Tr. 148.)  He reported taking no
medications. (Tr. 145.)  He denied having pain in his trunk, back,
extremities, joints, or abdomen.  Id.  He was in no distress.  Id.
It was noted that his hygiene was poor, but his motor activity was
normal.  (Tr. 148.)  It was noted that he looked angry.  Id.  It

was noted that plaintiff smoked two packs of cigarettes per day; drank a six-pack of beer per month; and smoked marijuana twice per week. (Tr. 150.) It was noted that he had been charged with marijuana possession the preceding month, and with DWI five years ago. Id. Plaintiff was diagnosed with paranoia and insomnia, was discharged, and advised to follow-up with his primary care physician. (Tr. 146, 154.)

Plaintiff was seen again in the St. Anthony's Emergency Room on October 6, 2003 with complaints of abdominal pain which had persisted for a few days. (Tr. 137-38.) A CT scan revealed diverticulitis of the descending colon in the left mid-abdomen. (Tr. 142.) A CT of the pelvis was negative. (Tr. 143.) Plaintiff was diagnosed with diverticulitis and instructed to follow up with Mark C. Gunby, D.O. (Tr. 139, 141.)

The record indicates that plaintiff saw Dr. Gunby at the Barnes Jewish Health Center (also "BJC") on March 24, 2004 with complaints of indigestion, and also reported experiencing back and elbow pain after stacking firewood. (Tr. 228, 270.) Upon exam, plaintiff was found to be in no distress, and inspection of his neck was normal. (Tr. 271.) He was non-tender and had full range of motion of his extremities. Id. He was able to heel-toe walk. Id. He was given Protonix[1], and trials of Celebrex[2] and Ultram.[3]

---

[1]Protonix, or Pantoprazole, is used to treat gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and injury of the esophagus. It is also used to treat conditions where the stomach produces too much acid.

Id.

Plaintiff returned to BJC on November 1, 2005, stating that he needed a refill on Protonix. (Tr. 268.) Plaintiff complained of lower back and neck pain, and stated that he had occasional numbness and tingling in his left upper extremity. Id. The assessment was gastroesophageal reflux disease (also "GERD"), low back pain, and neck pain with paresthesias. (Tr. 269.) It was noted that plaintiff had full range of motion and flexion of his neck. Id. Plaintiff was advised to continue taking Protonix and anti-reflux medication, and was given a Medrol Dose Pack,[4] and Skelaxin.[5] Id.

Plaintiff returned to BJC on November 1, 2005, stating that he needed a refill on Protonix. (Tr. 268.) Plaintiff complained of lower back and neck pain, and stated that he had occasional numbness and tingling in his left upper extremity. Id. The assessment was gastroesophageal reflux disease (also "GERD"), low back pain, and neck pain with paresthesias. (Tr. 269.) It was noted that plaintiff had full range of motion and flexion of his neck. Id. Plaintiff was advised to continue taking Protonix and anti-reflux medication, and was given a Medrol Dose Pack,[4] and Skelaxin.[5] Id.

Records from South County Health Center, the John C. Murphy Health Center, (also "Murphy Health Center") indicate that plaintiff was seen by Felicia Brown, M.D. on February 3, 2006 for a general examination. (Tr. 175.) Plaintiff stated that he needed

_____

http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601246.html

[2]Celebrex, or Celecoxib, is used to relieve pain, tenderness, swelling and stiffness caused by various forms of arthritis, and pain from other causes. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html

[3]Ultram, or Tramadol, is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html

[4]Medrol, or Methylprednisolone, is a corticosteroid is used to relieve inflammation, and is used to treat certain forms of arthritis; skin, blood, kidney, eye, thyroid, and intestinal disorders (e.g., colitis); severe allergies; and asthma. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html

[5]Skelaxin, or Metaxalone, is a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682010.html

a prescription for Cyclobenzaprine,[6] and stated that his elbows and back hurt. Id. He reported that he did not drink alcohol, but did smoke cigarettes. Id. He reported occasional insomnia. Id. He reported that he lived with his parents, was not employed, and was not looking for work. (Tr. 175.) Plaintiff reported taking Protonix, Cyclobenzaprine, and Tylenol. (Tr. 176.) Plaintiff reported his pain level as nine on a ten scale. Id. Upon exam, Dr. Brown noted that plaintiff was in no distress and was not sickly. Id. Cardiovascular and abdominal examination were both normal. Id. It was noted that plaintiff's blood pressure was elevated, and that he had a nonspecific abnormal ECG. (Tr. 176-77.) Plaintiff was given Cyclobenzaprine, and was advised to take a copy of his ECG to the hospital for evaluation. (Tr. 177.)

Plaintiff went to the Emergency Room of St. Anthony's Medical Center on that same date, and complained of left shoulder pain which had persisted for the past two years. (Tr. 155-56.) Plaintiff's symptoms were described as moderate, and he was not in distress. Id. No other relevant symptoms were noted. Id. A chest x-ray and an ECG were both negative. (Tr. 159-60.) It is indicated that the doctor thought plaintiff's symptoms were due to chest pain of undefined origin, but plaintiff left the hospital against medical advice. (Tr. 158, 164.)

---

[6]Cyclobenzaprine, also known as Flexeril, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

Plaintiff returned to the Murphy Health Center on February 14, 2006 and stated that he was there for follow-up for hypertension. (Tr. 173.) It was noted that he was taking aspirin, a muscle relaxant for back pain, and Tylenol for headaches and joint pains. (Tr. 173-74.) He rated his pain level as a one on a ten scale. Id. He reported intermittent chest pain while at rest, which lasted a few minutes. Id. Upon exam, he was noted to be in no acute distress, but obese. (Tr. 173.) Examination further revealed normal findings in plaintiff's chest, lungs, and heart. Id. He was diagnosed with esophageal reflux, and samples of Protonix were obtained for him. (Tr. 174.) He was referred to St. Louis ConnectCare cardiology, and was also instructed to follow-up in six weeks with Dr. Warner. (Tr. 173-74.)

Plaintiff was seen at BJC on February 16, 2006. (Tr. 265-66.) He was observed to be in no distress, and inspection of his neck and back were normal. (Tr. 266.) The majority of the notations from this visit are illegible. See (Tr. 265-66.)

The record indicates that plaintiff was seen at St. Louis ConnectCare on March 8, 2006 for follow-up from the abnormal EKG. (Tr. 186.) He indicated that he was taking Protonix, a muscle relaxant, Tylenol, and aspirin. (Tr. 187.) He indicated a history of hypertension, joint problems, numbness and weakness, and problems bending and lifting, but no chest pain and no other complaints. (Tr. (Tr. 187, 191-92.) He reported smoking one pack of cigarettes per day, and was advised to quit smoking. (Tr. 192.)

-9-

Plaintiff returned on May 3, 2006 for the results of his echocardiogram, and reported numbness and tingling in his left arm. (Tr. 189.) It is noted that he had no new complaints, and that his GERD symptoms improved on Protonix. Id. Examination was negative. Id. The assessment was controlled hypertension and chronic tobacco abuse. Id. He was released from care, and it was indicated that no further evaluation was necessary. (Tr. 190.)

Plaintiff returned on March 31, 2006 for follow-up care and stated that he had "no complaints," but also described a history of persistent moderate shoulder pain which had been occurring in a persistent pattern since a work-related accident. (Tr. 171.) Upon exam, plaintiff was noted to be alert, cooperative, in no acute distress, and not sickly, and had full range of motion of his neck. Id. Cardiovascular exam was normal. Id. There was no swelling, tenderness, clicking, crepitus, or decrease in range of motion in the left shoulder, but movement was painful. (Tr. 172.)

Plaintiff returned to the Murphy Health Center on April 6, 2006 with complaints of shoulder pain and numbness and tingling in his left hand. (Tr. 168.) He also complained of back and neck pain, which he described as occurring in a persistent pattern for years. Id. Plaintiff was taking Tylenol, Protonix,

Cyclobenzaprine, and Hydrochlorothiazide.[7]  Id.  X-rays of plaintiff's shoulder were "essentially unremarkable," and his neck appeared "mostly normal." (Tr. 169.) Lumbar spine films revealed anterior osteophytes at L-5, and disc space narrowing at L-5 and S-1.  Id.  Plaintiff had normal posture and a normal gait.  Id. Examination of plaintiff's cervical spine revealed restricted and painful extension, but no tenderness or crepitus.  Id.  There was no swelling of plaintiff's spine, but range of motion was decreased and movements were painful. (Tr. 169.) Crossed straight leg raising was negative.  Id.  Examination of plaintiff's left shoulder was negative and revealed full range of motion, and there was no swelling or pain.  Id.  A cervical CT scan was ordered, and he was given exercises.  Id.  He was also given Selenium Sulfide[8] lotion for his shoulders and back. (Tr. 168.)

Plaintiff returned on April 7, 2006 with complaints of periodontal disease, and examination revealed bleeding and inflamed gums. (Tr. 167.) He was instructed on oral hygiene.  Id.

A cervical spine CT on April 11, 2006 revealed cervical spondylosis throughout the cervical spine, posterior and to the

---

[7]Hydrochlorothiazide (sometimes called a "water pill") is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease. It causes the kidneys to get rid of unneeded water and salt from the body into the urine.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html

[8]Selenium sulfide, an anti-infective agent, relieves itching and flaking of the scalp and removes the dry, scaly particles that are commonly referred to as dandruff or seborrhea. It is also used to treat tinea versicolor, a fungal skin infection.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682258.html

right at the C7 - T1 level.  (Tr. 178.)  No herniated disc was
identified.  Id.

The record also contains additional medical evidence from
the Murphy Health Center, which plaintiff's counsel forwarded to
the ALJ following the hearing.  (Tr. 272-84.)  These records
indicate that plaintiff was seen on May 11, 2006 for a follow-up
visit and reported neck pain, but that exercises sometimes helped.
(Tr. 281.)  Plaintiff also reported that he had numbness and
tingling into his left arm down to his thumb and index finger, but
that the CT did not show any specific deficit other than
spondylosis.  Id.  Upon exam, plaintiff was noted to have normal
posture and a normal gait, with normal reflexes.  (Tr. 282.)
Cervical spine extension was restricted by pain, and examination of
plaintiff's shoulder was negative.  Id.  Plaintiff was diagnosed
with brachial neuritis or radiculitis, and given Celecoxib
(Celebrex).  Id.

Plaintiff returned on June 22, 2006 with complaints of
numbness and tingling in his left arm, and neck pain.  (Tr. 279.)
Shoulder x-rays were essentially unremarkable, and the neck
appeared mostly normal.  Id.  He had normal posture, and a normal
gait.  Id.  Plaintiff was referred to ConnectCare for an MRI, and
instructed to follow up as needed.  (Tr. 280.)

Plaintiff returned to the Murphy Health Center on June
28, 2006 with complaints of neck pain, numbness and tingling, and
shoulder pain.  (Tr. 276.)  Upon exam, he was in no acute distress,

with normal posture, and was noted to be obese. (Tr. 277.) He had full range of motion in all joints. (Tr. 278.) He was diagnosed with brachial neuritis or radiculitis, and given Hydrochlorothiazide. Id. Plaintiff returned on July 27, 2006 for follow-up, reporting no change. (Tr. 273.) It is indicated that plaintiff reported receiving a local anesthetic at the dentist's which seemed to totally relieve his arm pain, numbness and tingling. Id. It is indicated that plaintiff was taking Tylenol, Protonix, and Cyclobenzaprine. Id. Upon exam, plaintiff was noted to have normal posture and a normal gait, and full range of motion with no pain in his cervical spine. (Tr. 274.) He was advised to continue his present prescriptions, and it was suggested that he might benefit from epidural and/or facet injections. Id.

A physical residual functional capacity assessment was performed by B. Poskin on June 6, 2006.[9] (Tr. 197-202.) It is indicated that plaintiff stated that he was unable to stay on his feet, remain seated, or use his hands, and was also unable to lift moderate weight or walk a distance without pain. (Tr. 198.) Plaintiff also stated that his medications affected his sleep, and that he had some pain with dressing and bathing. Id. He further indicated that he mowed the grass, cleaned the house, walked, drove, shopped for groceries, read, watched television, and went

---

[9]Elsewhere in the record, Brooke Poskin is identified as a Disability Examiner and a DDS Counselor. See (Tr. 41, 136.) There is nothing in the physical residual functional capacity assessment indicating that the person who prepared it has any medical credentials.

fishing and hunting "as often as possible." Id. Plaintiff stated that prolonged activities caused pain, and that he had problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs. (Tr. 198-99.) Upon exam, plaintiff had decreased range of motion in his cervical and lumbar spine, but no swelling. (Tr. 199.) Plaintiff had full left shoulder range of motion, with no swelling or pain. Id. The assessment was brachial neuritis or radiculitis, NOS, and lumbago. Id.

It was opined that plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; could stand, walk, and sit for about six hours in an eight-hour day; and could push and pull without limitation. (Tr. 198.) There were no postural, manipulative, visual, or environmental limitations. (Tr. 200-201.) It was opined that plaintiff's complaints of pain were partially credible given his diagnosis of cervical spondylosis and findings in the lumbar spine, but plaintiff stated that he was able to mow the grass and do some household chores. (Tr. 202.)

An MRI performed at St. Anthony's Medical Center on August 22, 2006 revealed spondylosis worst at C5-6 and C6-7 with stenosis at C5-6. (Tr. 261.)

Plaintiff was seen again at BJC on September 12, 2006 with complaints of a rash. (Tr. 259.) He was given topical lotion. Id.

On October 3, 2006, plaintiff was seen at Greater St. Louis Neurosurgical Specialists. (Tr. 206-09.) He reported

moderate to severe lower back pain, pain in his left shoulder, and neck and arm pain with became severe and affected other parts of his body. (Tr. 206.) He reported smoking one pack of cigarettes per day for the past 20 years. (Tr. 208.)

Plaintiff was seen in consultation on January 5, 2007 by Paul H. Young, M.D., and reported cervical and lumbar spine symptoms. (Tr. 204-05.) Plaintiff reported achy, deep pain in his upper neck and lower back, and indicated that no therapies had been tried. (Tr. 204.) Examination was normal. <u>Id.</u> There was no swelling, tenderness, crepitus or deformity in plaintiff's neck or spine. <u>Id.</u> Plaintiff had full, painless range of motion of his neck and of his thoracic and lumbar spine, and had normal stability, and normal strength and tone in these areas. <u>Id.</u> He had full muscle strength bilaterally in his upper and lower extremities. (Tr. 204.) Deep tendon reflexes were normal and symmetrical, and straight leg raise testing was negative. (Tr. 204-05.) Cervical MRI films were reviewed and revealed a spur/osteophyte at C5-6. (Tr. 205.) Dr. Young recommended anterior cervical decompression at C5-6. <u>Id.</u> Dr. Young wrote, "I told the patient that I would proceed if he can quit smoking and make the changes in his life to show dedication to getting better and returning to work." <u>Id.</u> It is indicated that plaintiff would consider surgery and call the office to schedule it if he wished to proceed. <u>Id.</u>

Plaintiff returned to BJC on November 11, 2006, November

27, 2006 and December 5, 2006 for medication refills. (Tr. 256-58.) On December 8, 2006, plaintiff was seen at BJC and stated that he had no complaints, and that he had been taking Protonix and HCTZ (Hydrochlorothiazide) as prescribed. (Tr. 255.) Plaintiff stated that he had occasional chest wall/sternal pain, back pain, bilateral leg pain, and left arm pain. Id.

Plaintiff was seen at the BJC Health Center on December 24, 2006 with low back complaints, and was referred to a back specialist. (Tr. 254.) He was seen again at BJC on December 27, 2006, and was noted to be in no distress. (Tr. 253.) Inspection of his neck and back were normal, and he was assessed with GERD, hypertension, and low back pain. Id.

Plaintiff was seen at the BJC Health Center on January 8, 2007 stating that he was on Zegerid and that it helped. (Tr. 251.) He also reported that Darvocet worked better than Tramadol. Id. Examination of plaintiff's neck and back were normal. (Tr. 252.)

Plaintiff was seen in the BJC Health Center on March 20, 2007 in follow-up from an Emergency Room visit after falling while roller skating and injuring his right hip. (Tr. 249.) He indicated that he was taking Darvocet, Zegerid, and HCTZ. Id. Examination of plaintiff's neck and back were normal. (Tr. 250.)

Plaintiff returned to BJC on April 4, 2007 with complaints of right hip pain. (Tr. 247.) Radiological studies of plaintiff's right hip, performed on April 4, 2007, April 9, 2007 and April 17, 2007, revealed a benign tumor on the right femur.

(Tr. 242, 244, 246.)

The record indicates that plaintiff was seen at the Barnes Jewish Hospital Clinic (also "BJC") by Nadine Harris, and in the BJC Surgical Specialty Clinic by Ian G. Dorward, M.D., on April 6, 2007. (Tr. 222-27.) Plaintiff reported neck and leg pain which began after he fell at work while lifting a heavy machine. (Tr. 222-23, 225.) Plaintiff also indicated that surgery had been recommended by Dr. Young, and plaintiff indicated he desired a second opinion on this. (Tr. 225.) Plaintiff indicated that he had difficulty walking and getting dressed, but did not have trouble with bathing or grooming, or with activities of daily living, including cooking, cleaning, shopping, and driving. (Tr. 222.) Plaintiff stated that his neck pain was ongoing and was exacerbated by movement, and that his use of his upper extremities was limited. (Tr. 225.) He reported significant pain in his right leg which was exacerbated by a fall on March 11. Id. He reported smoking pack of cigarettes per day. Id. He told Nadine Harris that he was not interested in quitting smoking. (Tr. 222.) The record indicates that plaintiff was advised that it was important for him to quit smoking. Id.

Upon exam, Dr. Dorward noted plaintiff was in no acute distress. (Tr. 226.) He had no significant back tenderness, and straight leg raise testing yielded no significant shooting pains. Id. Spurling's maneuver did elicit pain in the neck upon turning to the right and left. Id. Motor strength was normal in the upper

and lower extremities. Id. Dr. Dorward reviewed plaintiff's August 2006 MRI and noted that it demonstrated diffuse degenerative cervical spine disease including a herniated disk at C5-6 and C6-7, and neuroforaminal stenosis diffusely throughout the cervical spine. (Tr. 226.) Dr. Dorward noted that plaintiff's lumbar spine x-ray revealed evidence of osteophytes and degenerative changes but preservation of disk height. Id. Dr. Dorward recommended further conservative methods, including physical and occupational therapy, and ordered an MRI. Id. He told plaintiff to stop smoking, advising that plaintiff would not be a surgical candidate if he continued to smoke. Id. Plaintiff returned to BJC on April 24, 2007 and indicated that he wanted medication to stop smoking. (Tr. 240.)

An MRI performed at Barnes Jewish Hospital on April 27, 2007 revealed multilevel degenerative disc disease; central posterior disc herniation at C5-C6; and a small disc herniation at C6-7. (Tr. 237.) Lumbar spine films taken on this date revealed mild degenerative changes of the lumbar spine. (Tr. 239.)

Plaintiff returned to BJC on May 8, 2007 with complaints of right sided pain with cough. (Tr. 235.) Examination revealed plaintiff to be alert and in no distress, and examination of his neck was normal. (Tr. 236.) A chest radiograph performed on May 8, 2007 revealed no evidence of acute cardiopulmonary disease, and radiological study of plaintiff's ribs were negative. (Tr. 233-34.) A CT scan of plaintiff's abdomen, performed on May 16, 2007,

-18-

revealed colonic diverticulosis with no evidence of acute diverticulitis, and small lesions, most likely cysts, on the liver. (Tr. 231.)

Plaintiff returned to BJC on June 8, 2007 and had a nerve root injection at C6. (Tr. 216-17.)

Plaintiff returned to BJC on June 29, 2007 and reported that he had had a benign tumor removed from his right hip, and reported pain and numbness. (Tr. 229.) He also complained of neck pain. Id. Upon exam, he was alert and in no distress. (Tr. 230.) Examination of his neck and back were normal, and his extremities were non-tender, with full range of motion, no edema, and a normal gait. Id.


## III. The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since January 15, 2004, plaintiff's alleged onset date. (Tr. 15.) The ALJ found that plaintiff had the severe combination of impairments of degenerative disc disease of the spine, cervical spondylosis, and obesity. Id. The ALJ found that plaintiff had the non-severe impairments of medication side-effects, diverticulitis/GERD, hypertension, and headaches, but found these impairments to be non-severe because they did not cause more than minimal limitation on the claimant's ability to perform basic work activities. (Tr. 16.) The ALJ also noted that

-19-

plaintiff had residuals from elbow surgeries, but that these residuals had not met the duration requirements of 20 C.F.R. §§ 404.1509 and 416.909, inasmuch as there was no evidence of follow-up care for a continuous period of at least 12 consecutive months. (Tr. 16.) The ALJ concluded that none of plaintiff's severe impairments were of listing-level severity. Id.

The ALJ concluded that plaintiff was unable to perform any past relevant work, but that he retained the residual functional capacity ("RFC") to perform the full range of light work.[10] Id. The ALJ also found that plaintiff was limited in his ability to lift and carry 20 pounds. (Tr. 20.) The ALJ acknowledged his duty to consider plaintiff's subjective complaints in accordance with Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984), and the Regulations and Social Security Ruling corresponding with Polaski and credibility determination. (Tr. 16.) The ALJ discussed plaintiff's hearing testimony and all of the medical evidence of record, and stated that he had carefully considered it. (Tr. 18-20.) The ALJ also wrote: "[t]he State Agency medical source statement is not signed. Anonymous reports prepared by a non-examining source, who may or may not be a medically acceptable source, are not entitled to any weight." (Tr.

---

[10]The Commissioner's Regulations provide that light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b). A job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. Id. To be considered capable of performing a full or wide range of light work, a person must be able to do substantially all of these activities. Id.

20.)[11]  The ALJ concluded that, while plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible.  (Tr. 18-20.)

The ALJ found that transferability of jobs skills was immaterial to the disability determination because applying the Medical-Vocational Rules directly supported a finding of "not disabled," regardless of whether plaintiff has transferrable job skills.  Id.  The ALJ found that, considering plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in substantial numbers in the national economy that plaintiff could perform.  Id.  The ALJ concluded that plaintiff was not under a disability, as defined in the Act, from January 15, 2004 through the date of the decision.  Id.

## IV.  Discussion

To be eligible for benefits under the Social Security Act, a plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992).  The

---

[11]While the ALJ references a "medical source statement," he was presumably referring to B. Poskin's June 6, 2006 physical residual functional capacity assessment.  The undersigned notes that, while the preparer's name is included on the assessment, it is not indicated that B. Poskin has any medical credentials.

Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. See 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A) (defining "disability" for DIB and SSI purposes). The Act provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." Id. It further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

        To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one

which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. If the claimant's impairment is severe, the Commissioner then determines whether it meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young o/b/o Trice v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and

consider:

    1.    The credibility findings made by the ALJ;

    2.    The plaintiff's vocational factors;

    3.    The medical evidence from treating and consulting physicians;

    4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

    5.    Any corroboration by third parties of the plaintiff's impairments;

    6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

    The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003) (citing Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).

    Plaintiff herein challenges the ALJ's RFC assessment, arguing that it was conclusory and was not based upon medical

-24-

evidence.  Plaintiff also contends that the ALJ failed to provide a function-by-function assessment or a narrative discussion to support his RFC determination.  Plaintiff also contends that the ALJ erroneously relied upon the Medical-Vocational Guidelines, inasmuch as plaintiff suffered from severe non-exertional impairments.  In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.  Review of the ALJ's decision reveals that his RFC determination is not supported by substantial evidence on the record as a whole because the record contains no medical evidence addressing how plaintiff's impairments affect his ability to function in the workplace.[12]

Residual functional capacity is what a claimant can do despite his limitations.  20 C.F.R. §404.1545, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  At the fourth step, while the burden of proof is still upon the claimant, the Commissioner determines whether the claimant has the RFC to perform his or her past relevant work, and if so, the claimant is determined not

_____

[12]Although plaintiff herein does not challenge the ALJ's credibility determination, he does challenge the ALJ's RFC determination.  Because the ALJ must first evaluate a claimant's credibility before determining his RFC, Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005), the undersigned conducted a full analysis of the ALJ's credibility determination.  In assessing plaintiff's credibility, the ALJ acknowledged his duty to consider all of the evidence of record relevant to plaintiff's complaints, cited the Polaski decision, and set forth the relevant factors.  The ALJ then set forth numerous inconsistencies in the record detracting from plaintiff's credibility.  Where adequately explained and supported, credibility findings are for the ALJ to make. See Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir. 2000). The undersigned has carefully reviewed the record, and believes that the ALJ's finding that plaintiff's subjective complaints were not fully credible was adequately explained, and was supported by the record as a whole.

disabled.  Pearsall, 274 F.3d at 1217.  If, as in the case at bar, the ALJ finds that the claimant's impairments preclude the performance of past relevant work, the ALJ continues to step five, where the burden shifts to the Commissioner to prove both that the claimant retains the RFC to perform other kinds of work, and that such work exists in substantial numbers in the national economy. Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (citing Nevland, 204 F.3d at 857.)  In so doing, the ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir.  2005); 20 C.F.R. §§ 404.1545(a), 416.945(a).

A claimant's RFC is a medical question, however, and some medical evidence, along with all other relevant, credible evidence in the record, must support the ALJ's RFC determination.  Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.  2000). The ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003) (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)); Nevland, 204 F.3d at 858.  "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform

-26-

exertional tasks, or in other words, 'what the claimant can still do' despite his or her physical limitations." Lewis, 353 F.3d at 642 (citing Bradshaw v. Heckler, 810 F.2d 786, 790 (8th Cir. 1987) and 20 C.F.R. § 404.1520(e)). It is also well settled that the ALJ has a duty to fully and fairly develop the record, even when, as here, the claimant is represented by counsel. Nevland, 204 F.3d at 857 (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983)).

In this case, as in Nevland, plaintiff presented medical evidence establishing that he suffered from medically determinable impairments which prevented him from performing his past relevant work. As noted above, the ALJ found that plaintiff had the severe impairments of degenerative disc disease of the spine, cervical spondylosis, and obesity. However, it is unclear from this administrative record how plaintiff's impairments, which the ALJ found prevent plaintiff from performing his past relevant work, affect his residual functional capacity to do other work. While the record contains numerous treatment records addressing, inter alia, plaintiff's subjective complaints, the findings upon physical exam, and findings upon radiological study, none of the medical evidence addresses how plaintiff's impairments affect his ability to function physically. Absent such evidence, it cannot be said that substantial evidence supports the ALJ's RFC assessment. The issue is not whether plaintiff has impairments, but how his impairments are affecting his ability to function physically. Lewis, 353 F.3d at 646; Krogmeier, 294 F.3d at 1023 Nevland, 204

F.3d at 858.

　　　　In addition, while the state agency's physical residual functional capacity assessment addressed how plaintiff's impairments affect his ability to function, the ALJ specifically stated that he gave it no weight.[13]  Even so, the ALJ made no attempt to solicit a medical opinion from any of plaintiff's treating doctors, or obtain a consultative examination, about how plaintiff's impairments affect his ability to function in the workplace.  This does not satisfy the ALJ's duty to fully and fairly develop the record.

　　　　The Commissioner contends that plaintiff cited no evidence conflicting with the ALJ's findings, and cites no evidence indicating any functional restrictions beyond those found by the ALJ.  While the Commissioner is indeed correct, this argument underscores the fact that the record contains no evidence addressing plaintiff's ability to function physically.  While the ALJ must assess a claimant's RFC based upon all relevant evidence, RFC is a medical question which must be supported by some medical evidence, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.  Lauer, 245 F.3d at 704 (internal citations omitted); Nevland, 204 F.3d at 858. The ALJ is not permitted to draw his own inferences from medical

---

[13]Even had the ALJ assigned weight to the RFC assessment, it could not have supported the ALJ's RFC determination, inasmuch as it was apparently  prepared by a person with no medical credentials.  Dewey v. Astrue, 509 F.3d 447, 448 (8th Cir. 2007) (reliance upon a person with no medical credentials as a medical consultant in determining RFC was erroneous.)

reports.  Nevland, 204 F.3d at 858 (internal citations omitted.)

Having found that the ALJ's RFC determination was not supported by

medical evidence, the undersigned declines to reach plaintiff's

arguments that the ALJ failed to conduct a function-by-function

analysis or provide a narrative discussion to support his RFC

determination.

The undersigned additionally notes that the ALJ in this

case found that plaintiff suffered from the severe impairment of

obesity, and the medical evidence establishes that plaintiff's

medical treatment providers found him to be obese.  Although

obesity is no longer, in itself, a listed impairment, the

Commissioner's Regulations specifically instruct that the

cumulative effects of obesity must be considered with a claimant's

other impairments, particularly in cumulation with impairments of

the musculoskeletal system.  20 C.F.R. 404, Subpt. P, App. 1, §

1.00(Q).  The ALJ's failure to assess plaintiff's obesity resulted

in a legally deficient decision regarding plaintiff's ability to

perform work-related activities.  On remand, the ALJ should

consider and evaluate plaintiff's obesity in combination with his

other impairments as required by the Social Security Regulations

and Ruling 02-1p, 2000 WL 628049, at *1 (SSA, Sept. 12, 2002).

Plaintiff also contends that the ALJ's failure to elicit

vocational expert ("VE") testimony was error, inasmuch as the

record shows that plaintiff suffers from pain, and also experiences

difficulty sitting, standing, walking, using his hands,

remembering, and concentrating. In response, the Commissioner argues that the presence of non-exertional impairments does not preclude the use of the Medical-Vocational Guidelines (also "Guidelines" or "Grids") if the non-exertional impairments do not further limit the claimant's ability to perform the full range of work.

The Medical-Vocational Guidelines are a set of rules that direct whether the claimant is or is not disabled "[w]here the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule." 20 C.F.R. pt. 404, subpt. P., app. 2, § 200.00(a). An ALJ may rely upon the Guidelines if the record supports the ALJ's finding that the non-exertional impairment does not diminish the claimant's RFC to perform the full range of activities. McGeorge v. Barnhart, 321 F.3d 766, 768-69 (8th Cir. 2003).

In the case at bar, the undersigned has determined that the ALJ's RFC determination is not supported by substantial evidence on the record as a whole, and therefore does not reach plaintiff's allegation that the ALJ erroneously relied upon the Guidelines. Upon remand, it will be for the Commissioner in the first instance, after properly determining plaintiff's RFC, to decide whether to rely upon the Guidelines or to obtain vocational expert testimony.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **REVERSED** and this cause **REMANDED** to the Commissioner for further proceedings consistent with this opinion. Judgment shall be entered accordingly.

_Frederick R. Buckles_
FREDERICK R. BUCKLES
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of September, 2009.